AO 106 (Rev. 04/10) Application for a Search Warrant



FILED

FEB 1 5 2018

CLERK U S DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                                    DEPUTY

# UNITED STATES DISTRICT COURT
### for the
### Southern District of California

| | |
|---|---|
| In the Matter of the Search of ) | |
| *(Briefly describe the property to be searched* ) | Case No. |
| *or identify the person by name and address)* ) | |
| HP TouchSmart 610 All-In-One Computer ) | **18MJ0710** |
| ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
**See Attachment A**

located in the _____ **Southern** _____ District of _____ **California** _____ , there is now concealed *(identify the person or describe the property to be seized)*:
**See Attachment B**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 1962(d), 1028(a)(7), 1029(a)(3), 1343, 1030, 1344, 1956 | Conspiracy to Engage in a Racketeer Corrupt Influenced Organization; Identity Theft; Possession of Unauthorized Access Devices; Wire Fraud; Fraud and Related Activity in Connection with Computers; Bank Fraud; Money Laundering |

The application is based on these facts:
**See Affidavit of SA Beau Menvielle**

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Beau Menvielle, HSI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: **FEB. 14, 2018**

_____
*Judge's signature*

City and state:  San Diego, CA

Andrew G. Schopler, Magistrate Judge
*Printed name and title*

AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Beau Menvielle, Special Agent ("SA") with the Department of Homeland Security ("DHS"), Homeland Security Investigations ("HIS"), being duly sworn, hereby depose and state as follows:

## I.   **INTRODUCTION**

1.    I make this affidavit in support of an application for issuance of a search warrant, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, for HP Touchsmart 610 computer belonging to  David Jonathan VARGAS, as further described in Attachment A (the "TARGET COMPUTER").

2.    The purpose of the search warrant is to seize property, more fully described in Attachment B, that constitutes evidence and fruits of federal crimes, including: 18 U.S.C. § 1962(d) (Conspiracy to Engage in a Racketeer Corrupt Influenced Organization); 18 U.S.C. § 1028(a)(7) (Identity Theft); 18 U.S.C. § 1029(a)(3) (Possession of More than Fifteen Unauthorized Access Devices); 18 U.S.C. § 1343 (Wire Fraud); 18 U.S.C. § 1030 (Fraud and Related Activity in Connection with Computers); 18 U.S.C. § 1344 (Bank Fraud); and 18 U.S.C. § 1956 (Money Laundering).

3.    My knowledge of the facts alleged in this affidavit is based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers; open source searches; my review of documents related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; conversations with other agents experienced in fraud investigations; and information gained through my training and experience.   Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation. All the dates, times, and amounts listed in this affidavit are approximate.

1  4.   I have been employed as an HSI Special Agent from March 2008 to present.
2  I am currently assigned to the Cyber Intrusion Group with the Office of the Special Agent
3  in Charge (SAC), San Diego, California.  In this capacity, I conduct investigations into
4  networks responsible for stealing financial, proprietary and export controlled data from
5  U.S. businesses via cyber intrusion.  In previous capacities, I have conducted investigations
6  into individuals responsible for illicitly procuring and transshipping U.S. origin military
7  technology and hardware to China and Iran, contrary to U.S. export laws and regulations,
8  and I have conducted investigations into individuals and networks responsible for
9  smuggling large quantities of methamphetamine, cocaine and heroin from Mexico into the
10 U.S. via the San Ysidro, Otay Mesa, and Tecate, California, Ports of Entry.

11  5.   I have received training from the Federal Law Enforcement Training Center
12 in the area of financial investigations and cybercrimes. I have also received training and
13 accreditation from the SANS Institute in the areas of SEC 501, Advanced Security
14 Essentials Enterprise Defender, and SEC 504, Hacker Tools, Techniques, Exploits and
15 Incident Handling.  I have a Bachelor's Degree in Political Science from the University of
16 California, Los Angeles, and I served 4 years honorably in the United States Marine Corps.

17 **II.  STATEMENT OF PROBABLE CAUSE**

18 **A.  Background**

19  6.   Law enforcement has been investigating the Infraud.su Organization, a
20 sophisticated transnational criminal carding organization.  The Infraud.su Organization is
21 engaged in multiple illicit activities which include, but are not limited to: large scale
22 trafficking of compromised credit card data and counterfeit instruments (counterfeit
23 identifications and counterfeit credit cards), money laundering, and various types of
24 computer crimes.  The Infraud.su Organization utilizes a virtual clubhouse located at the
25 website domain "infraud.su" where the worldwide membership congregates to purchase
26 illicitly obtained data and share knowledge and modus operandi of various fraud schemes
27 in an effort to maximize the amount of money they obtain.

28 //

**B.**   **David Jonathan VARGAS, a.k.a. "Cashmoneyinc"**

7.     On or about September 19, 2017, a federal Grand Jury seated in the District of Nevada indicted 36 members of the Infraud.su Organization, including David Jonathan VARGAS, a.k.a. "Cashmoneyinc," for violations of Title 18, United States Code, Section 1962(d) (Conspiracy to Engage in a Racketeer Corrupt Influenced Organization). On or about October 31, 2017, that same Grand Jury returned a superseding indictment charging various members of the Infraud.su Organization with nine counts of Title 18, United States Code, Section 1029(a)(3) (Possession of More than Fifteen Unauthorized Access Devices). The Infraud.su Organization, as alleged in the indictment, participated in a pattern of racketeering activity that included multiple violations of  Title 18, United States Code, Section 1028(a)(7) (Identity Theft); Title 18, United States Code, Section 1029(a)(3) (Possession of More than Fifteen Unauthorized Access Devices); Title 18, United States Code, Section 1343 (Wire Fraud); Title 18, United States Code, Section 1030 (Fraud and Related Activity in Connection with Computers); Title 18, United States Code, Section 1344 (Bank Fraud); and Title 18, United States Code, Section 1956 (Money Laundering).

8.     As set forth in greater detail below, VARGAS joined the Infraud.su Organization in or around August 2011. He advertised as a vendor of "carded travel services " for Infraud membership. VARGAS remains a member of the Organization to the present day.

**C.**   **Definition of Terms**

9.     The following terms have the indicated meaning in this affidavit:

a.     "Carding" refers to the general concept of purchasing retail items with counterfeit credit cards or stolen credit card information.  Such a scheme may involve a counterfeit credit card that has been encoded with legitimate victim account information, and is presented to a store's cashier by the offender.  Often, various false identification documents are used to facilitate this fraud.  "Carding" or "Carders" is also the term used by members of a carding organization to describe themselves.

b.      "In-store carding / Real Carding" occurs when the carding committed by an individual requires his or her physical presence inside a retail store when making the fraudulent purchase. In such a scheme, a counterfeit credit card that has been encoded with legitimate victim account information is presented to the cashier by the offender.  Often, various false identification documents are used to facilitate this fraud.

c.      "Carding online / Virtual Carding" refers to carding committed in an online Internet transaction.

d.      "Nic" refers to the screen name or nickname chosen by a member of the criminal organization by which that member will be known to other members. Individuals often are known by and conduct their criminal business under more than one alias nic.

e.      "Dumps" are compromised credit card account data.

f.      "D+P" refers to dumps with the corresponding personal identification number (PIN), which are utilized to withdraw funds directly from an ATM machine.

g.      "Drop" can have several different meanings depending on the context in which it is used, but generally refers to a location or individual who can securely receive illicitly-derived money or goods. An example would be "do you have a drop I can ship a laptop to?"

h.      "CVV" refers to compromised credit card account data that typically contains all of a cardholder's information except the magnetic track contained on the rear of their credit card.  This information includes an account holder's name, date of birth, social security number, address, telephone number, and mother's maiden name, as well as the security code on the rear of the credit card.

i.      "Holograms" are labels with a hologram printed onto it for security reasons.  They are commonly found on genuine credit cards and identifications.

j.      "PM" means private message and any non-public message sent between individuals on the criminal organization's website.

k.  "Ripper" refers to a member of a carding organization that has stolen from another member.  These individuals are typically expelled from the carding organization and their access to the organization's websites is denied.

l.  "BIN" refers to the Bank Identification Number of a credit card account number which is represented by the first six digits of the account number.  The Bank Identification Number identifies the credit card issuing bank. For example, 546616 is a BIN that identifies Citibank.

m.  "Cashout service" is a term used to describe the transfer of funds, typically used in connection with obtaining and laundering illicitly obtained funds from compromised bank and credit card accounts.  The members providing cashout services receive a fee, which is typically between five percent and ten percent of the total funds laundered.

n.  "Forum/Website" are terms used interchangeably to describe the online gathering place used as a meeting location for the members of a carding organization.

o.  "Imaging" or "copying" refers to an accurate reproduction of information originally contained on a physical electronic data storage device.  "Imaging" or "copying" maintains contents, but some attributes may change during the reproduction depending on the method used. Other forensically-sound methods are able to provide bit-for-bit accurate duplicates of the copied data, with no change in metadata or other attributes.

p.  "Internet Service Providers," or "ISPs," are commercial organizations that provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers including access to the Internet, web hosting, email, remote storage, and co- location of computers and other communications equipment.  ISPs can offer various means by which to access the Internet, including telephone-based dial-up, broadband-based access via a digital subscriber line (DSL) or cable television, dedicated circuits, or satellite-based subscription. ISPs typically charge a fee based upon the type of

1  connection and volume of data, called bandwidth, which the connection supports.  Many
2  ISPs assign each subscriber an account name, such as a user name or screen name, an email
3  address, and an email mailbox, and the subscriber typically creates a password for the
4  account.  By using a computer equipped with a telephone or cable modem, the subscriber
5  can establish communication with an ISP over a telephone line or through a cable system,
6  and can access the Internet by using his or her account name and password.

7        q.    "ISP Records" are records maintained by ISPs pertaining to their
8  subscribers (regardless of whether those subscribers are individuals or entities).  These
9  records may include account application information, subscriber and billing information,
10  account access information (often in the form of log files), email communications,
11  information concerning content uploaded and stored on or via the ISP's servers, and other
12  information, which may be stored both in computer data format and in written or printed
13  record format.  ISPs reserve or maintain computer disk storage space on their computer
14  system for their subscribers' use.  This service by ISPs allows for both temporary and long
15  term storage of subscribers' electronic communications and many other types of electronic
16  data and files.

17        r.    "Internet Protocol address," or "IP address," refers to a network
18  identifier used by a computer to access the Internet.  IP addresses can be dynamic, meaning
19  that the Internet Service Provider (ISP) assigns a different identifier to a computer
20  periodically when it accesses the Internet. IP addresses might also be static, that is, an ISP
21  assigns a user's computer a particular IP address which is used every time the computer
22  accesses the Internet.

23        s.    "Uniform Resource Locator," or "URL," also known as a "Domain
24  Name" or web address, is a specific character string that constitutes a reference to a
25  resource.  In most web browsers, the URL of a web page is displayed on top inside an
26  address bar.  An example of such a URL would be "http://www.example.com".

27        t.    "Web hosting" services maintain server computers connected to the
28  Internet. Their customers use those computers to operate websites on the Internet.

1  Customers of web hosting companies place files, software code, databases, and other data
2  on servers. To do this, customers typically connect from their own computers to the server
3  computers across the Internet.

4          u.       "Bulletproof Hosting" or "Abuse Hosting" is a service provided by a
5  domain hosting or web hosting firm that allows their customers considerable leniency in
6  the kinds of material the customer uploads and distributes from the firm's servers. Such
7  material may include spam, compromised credit card data, high-yield invest program
8  (HYIP) schemes, online gambling, and child pornography.

9          v.       "Proxy" or "Proxy Server" describes a computer system or an
10 application that acts as an intermediary between other computers or servers (e.g. "clients")
11 that are seeking resources from other clients. For example, a user connects to a proxy
12 server, requesting a specific web page. The proxy server will pass the user request to the
13 remote website server. The remote website server will respond to the request by providing
14 the web page to the proxy server. The proxy server will then return the web page to the
15 original requesting user. Proxies are most frequently used to provide anonymity by
16 obscuring a user's true IP address while accessing or hosting content on the World Wide
17 Web.

18         w.       "Socket Secure" or "SOCKS" is a computer-networking term used to
19 describe a computer internet protocol that is similar to a proxy, but with a difference in the
20 manner in which requests are passed through the intermediary (most frequently a computer
21 server). For example, with a standard proxy (as described above), a user sends a request
22 to a proxy server, the proxy server then passes along the request to the end destination just
23 as if the user was doing it directly. A user running SOCKS will submit a request to the
24 SOCKS server in the same manner as a normal proxy; however, instead of the SOCKS
25 server simply passing along the request, the SOCKS server will reinitiate the request
26 making it appear as if the originating user is actually the SOCKS server. The SOCKS
27 protocol provides an additional layer of security to proxy use, and also allows for the use
28 of encrypted protocols that originate from the SOCKS server.

1    x.    A "Denial-of-Service Attack" (or "DOS") is an attempt to make a
2  computer, server, or network resource unavailable to its intended users through saturating
3  a target machine or network with external communication requests so that the machine or
4  network cannot respond to legitimate requests in a timely manner.  A distributed denial-of-
5  service ("DDoS)" attack occurs when multiple systems simultaneously flood the
6  bandwidth or resources of the targeted system.  A DDoS attack has significant advantages
7  that make defense against such an attack more difficult.

8    y.    An "Anti-DDoS Service" provides automated and manual support for
9  websites in fighting a DDoS attack.  The support generally involves attempting to separate
10 legitimate traffic to the website from illegitimate traffic caused by the attack.  The process
11 is done by examining different attributes of the incoming traffic to filter the illegitimate
12 traffic.

13   z.    "ICQ" is a free instant messaging electronic communication service, or
14 "chat" service. ICQ user accounts are identified by a Universal Identification Number, or
15 "UIN." An ICQ user may store frequently used UINs in a "buddy list" or contact list.

16   aa.    "Jabber" is a chat service similar to ICQ.

17   bb.    "Malicious computer software" or "Malware" is computer software
18 designed and/or deployed for malicious purposes, including computer viruses, worms, and
19 Trojans.  Malware is frequently deployed onto a victim computer through spam emails,
20 fake websites, and intrusions.

21   cc.    A "bot" is generally defined as a software application that runs
22 automated tasks over the internet.  Bots are frequently used for malicious purposes.  Such
23 a malicious bot may be created surreptitiously by taking control of a victim third-party
24 computer through the use of malware.  The controller of these maliciously created bots can
25 then remotely execute commands on the victim computer.

26   dd.    A "botnet" is a collection of computers running similar programs that
27 communicate over the internet to collectively perform a task.  Botnets are frequently used
28 for malicious purposes.  Such malicious botnets are frequently created by infecting a large

1  number of victim third-party computers with the same malware.  A malicious botnet is
2  frequently the source of a DDoS attack.

3       ee.    "Digital Currency" or "Virtual Currency" is an electronically created
4  and stored medium of monetary exchange that generally lacks legal tender status in any
5  jurisdiction, but has an equivalent value in real currency, or acts as a substitute for real-
6  world "fiat" currency. Examples include Bitcoin, Perfect Money, Liberty Reserve, and
7  WebMoney.

8       ff.    The terms "communications," "records," "documents," "programs," or
9  "materials" include all information recorded in any form, visual or aural, and by any means,
10 whether in handmade form (including, but not limited to, writings, drawings, paintings),
11 photographic form (including, but not limited to, pictures or videos), or electrical,
12 electronic or magnetic form, as well as digital data files.  These terms also include any
13 applications (i.e. software programs).  These terms expressly include, among other things,
14 e-mails, instant messages, chat logs, correspondence attached as to e-mails (or drafts),
15 calendar entries, and buddy lists.

16       gg.    "CR80" documents means credit card related documents and items
17 such as plastics, holograms, magnetic strips, and identifications.

18 **D.    Background on Use of Computers, and Criminal Carding Organizations**

19       10.    Based upon my training and experience in the investigation of criminal
20 carding organizations, such as the Infraud.su Organization, and information related to me
21 by other law enforcement officers with extensive training and experience in the
22 investigation of criminal carding organizations, I know the following information about
23 the use of computers with criminal carding organizations.

24       11.    Individuals who participate in criminal carding organizations, including the
25 Infraud.su Organization, have defined roles, described as follows:

26       a.    Administrators – Administrator(s) is (are) an individual(s) that serve as
27 a governing council of each criminal organization who, collectively, control the destiny of
28 the organization.  The administrator(s) handle day to day management decisions of the

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT

1  organization, as well as long term strategic planning for its continued viability.  They
2  determine which individuals are permitted to become and remain members of the criminal
3  organization; the functions, responsibilities, and levels of access to information for all
4  members of the organization; and the rewards accorded members for their loyalty to the
5  organization as well as the punishments meted out to members evidencing disloyalty to the
6  organization. Furthermore, they decide when, how, and under what circumstances to attack
7  and to retaliate against members of rival criminal organizations and their associated
8  Internet websites (forums).  The administrator(s) are accorded full access to, and privileges
9  on, the computer servers hosting the corresponding criminal organization's websites, and,
10  thus, have ultimate responsibility for the physical administration, maintenance, and
11  security of these computer servers, as well as for the content of the websites.

12          b.      Moderators – Moderators oversee and administer one or more subject-
13  matter specific areas on the website that either fall within an area of their expertise or cover
14  their geographic location, limiting their activities to editing and deleting posts by members
15  on these forums and mediating disputes.  Moderators also frequently serve as reviewers for
16  particular products or services with which they have an expertise.

17          c.      Reviewers – Reviewers examine and test products and services that
18  members of the criminal organization desire to advertise and sell on the organization's
19  websites (i.e., dumps and counterfeit documents) and post a written summary of that
20  examination or testing on the appropriate website.   A favorable written review is a
21  prerequisite to vending contraband on the websites hosted by the criminal organization.
22  While most reviewers primarily serve in the capacity of administrator or moderator, any
23  qualified individual, even a general member, can be appointed by an administrator to
24  conduct a review.

25          d.      Vendors – Vendors advertise and sell products and services to members
26  of the criminal organization by way of the associated websites after the product or service
27  has received a favorable written review from a reviewer.  Once a reviewer is designated, a
28  prospective vendor is required to ship multiple samples of the product or provide access to

1   the service to facilitate completion of the review. This contact between the prospective
2   vendor and the reviewer is usually made through a private email message or through a
3   public post in a particular section on the relevant website.

4            e.      Members – General members of the criminal organization typically use
5   the organization's websites to gather and provide information about perpetrating criminal
6   activity; share information with and solicit other members to engage in their criminal
7   schemes; use the website's vendors to facilitate their unlawful purchases of credit card
8   dumps, false identification documents, and other contraband; and seek to have their
9   individual disputes settled by the Administrator(s) or Moderators.

10           12.     Communication Methods: Although the exact methodology of one carding
11  organization may slightly differ from another, there are certain patterns of conduct that
12  remain the same across these organizations. To that end, the individuals who make up the
13  various levels of the organization seek to remain as anonymous as possible, even to other
14  members, in an effort to avoid detection by law enforcement. It is not uncommon for the
15  members of the organization to conspire to perpetrate a large-scale criminal scheme that
16  will result in the theft of millions of dollars, but the individuals actually committing the
17  fraud will have no knowledge of the true identities of other actors. Instead, they will know
18  the other conspirators only by their nics. And because many members will have multiple
19  nics aside from the one by which they are most well-known in the carding community, co-
20  conspirators may not even know the primary nic of the individual(s) they are working with
21  to perpetrate a given fraud or carding scheme.

22           a.      To achieve this level of privacy, individuals in the criminal organization
23  use any means possible to obfuscate their identities. This includes using proxies, VPNs,
24  non-US based email services or email services that offer encryption, and the use of drops
25  in the event that there is a need to receive a physical item.

26           b.      All of the above-described means of evasion are easily achievable by a
27  member of the organization who has been active for even a moderate period of time. Even

28

AFFIDAVIT IN SUPPORT OF APPLICATION                    11
FOR SEARCH WARRANT

a new member could simply contract any of these particular services from a reviewed vendor on the forum.

13.     The individuals in the criminal organization communicate with each other most frequently by way of some type of electronic means.  This includes posting on the organization's forum (typically reserved for less sensitive topics or to comment on the service of a particular vendor), via PM using the organization's website, via email (especially when files or large quantities of information need to be transferred), and via ICQ or Jabber chat services.

E.     **The Infraud Investigation**

14.     Starting in approximately January 2018, I have spoken with HSI Special Agent Michael P. Adams (SA Adams), the lead case agent on the Infraud investigation, on numerous occasions and I have reviewed numerous law enforcement materials and learned the following:

15.     Since approximately October 2010, investigators have been extensively reviewing and monitoring the activities of the Infraud.su Organization.  Through the use of cooperating sources and undercover agents, investigators have been able to observe and interact with the Infraud.su Organization membership and observe its activities. Investigators have determined that the Infraud.su Organization is structured and operates in a manner similar to other carding organizations, and that the Infraud.su Organization exists solely to engage in criminal activity.

a.     The leaders of the Infraud.su Organization are former high-ranking members of a former criminal carding organization called Carder.su.   Carder.su was the subject of a RICO prosecution in the District of Nevada (2:12-CR-004-APG-GWF). The Infraud.su Organization's leader, Svyatoslav Bondarenko a.k.a. Obnon a.k.a. Rector, was formerly the second in command of the Carder.su Organization.  After a falling out between Bondarenko and the leader of the Carder.su Organization, Bondarenko formally broke ties with the Carder.su Organization.   Bondarenko formed the Infraud.su

Organization, and in the process successfully recruited some of the ranking Carder.su members to join him.

b.    Within the Infraud.su Organization, there are two additional positions which are unique to the Infraud.su Organization—the Fratello Mason and Supermoderator. The Fratello Mason are the VIP members of the Infraud.su Organization, and this title is used as a method to distinguish the members holding that status from the general membership.   Supermoderators rank between administrators and moderators and have more access and control than moderators do on the forum, but less than administrators.

16.    Infraud.cc, which has also used the domain names of Infraud.su and Infraud.wf in addition to others, is the forum for the Infraud.su Organization.  An image of infraud.cc was obtained from Latvia in 2011 pursuant to a Mutual Legal Assistance Treaty (MLAT) request (the 2011 image).   The 2011 image was found to contain not only information related to the sale of dumps, CVVs, and counterfeit credit cards, but also discussion by the membership of the Infraud.su Organization of how to use those items to commit access device fraud. SA Adams maintains an undercover persona in the Infraud.su Organization and regularly logs into the infraud.cc website, observing advertisements and communications about the sale of dumps, CVVs, and counterfeit credit cards.  SA Adams last accessed infraud.cc on or about November 15, 2017.

17.    Until approximately 2016, Carderbase.su was the "feeder" forum for the Infraud.su Organization.  This website was created to facilitate the vetting of individuals interested in joining the Infraud.su Organization prior to their admission into the main organization.  SA Adams, using his undercover persona in the Infraud.su Organization, regularly logged into the carderbase.su website, observing advertisements and communications about the sale of dumps, CVVs, and counterfeit credit cards.  SA Adams last accessed carderbase.su on or about March 29, 2016.

18.    In approximately October 2014, SA Adams provided a Carder.su cooperating defendant (Carder.su cooperator) a list of websites that appeared to be hosted by the cooperator's associate.  The list included the infraud.cc and carderbase.su websites.  On or

1  about October 28, 2014, SA Adams received from the Carder.su cooperator instructions to

2  access a remote server that contained copies of the websites infraud.cc and carderbase.su.

3  SA Adams subsequently downloaded the copies of the infraud.cc and carderbase.su

4  websites.  After downloading the copies of infraud.cc and carderbase.su websites, SA

5  Adams briefly surveyed the structure and type of the files to verify that the contents were

6  consistent with what was purported by the Carder.su cooperator.  A cursory survey of the

7  files contained within the copies revealed computer files that appeared to be consistent with

8  the types that comprise websites.

9      19.    On or about November 25, 2014, United States Magistrate Judge Nancy

10  Koppe for the District of Nevada signed a federal search warrant (2:14-mj-0778-NJK)

11  authorizing the search of the copies of the infraud.cc and carderbase.su websites

12  downloaded by SA Adams on or about October 28, 2014.

13      20.    On or about November 26, 2014, SA Adams executed the search warrant on

14  the copies of the infraud.cc and carderbase.su websites.  Review of the contents of the

15  websites revealed numerous postings and private messages related to the use, production,

16  and trafficking of compromised credit card account data, the manufacture of counterfeit

17  credit cards and counterfeit identifications, the sale and use of malicious computer

18  software, and the movement of illicitly-derived digital currency.

19      21.    Starting in approximately February 2015 and continuing to March 2017, SA

20  Adams repeated the process described in paragraphs 18-20 above.  Namely, SA Adams

21  requested that the Carder.su cooperator contact his/her associate and ask for updated copies

22  of the infraud.cc and carderbase.su websites, received instructions from the Carder.su

23  cooperator to access a remote server that contained images of the copies, downloaded the

24  copies, sought and obtained federal search warrants authorizing the search of the copies,

25  and executed the search warrants.  In total, SA Adams received six copies of the Infraud.cc

26  and carderbase.su websites during this time period.

27  **F.    VARGAS' Criminal Activity as Part of the Infraud Organization**

28

22.     VARGAS joined the Infraud.su Organization in approximately August 2011. He utilized the nic "Cashmoneyinc" to participate in the Infraud Organization and to conduct the criminal activity detailed below.

23.     VARGAS advertised on the Organization's forum as a purveyor of "carded travel services," which involved the use of fraudulent payment information to purchase travel arrangements, hotel reservations, or event tickets for clients, which he would then turn around and provide to the client for a fraction of the face value of the purchased services. Specifically, VARGAS committed the following acts on the following dates:

a.     On or about August 9, 2012, VARGAS purchased two CVVs from indicted co-conspirator LIRIDON MUSLIU. A copy of MUSLIU's automated vending site, "CCstore," had previously been obtained by federal law enforcement via a cooperating defendant in another case, and searched pursuant to a federal warrant. Analysis of that database revealed that a CCstore customer account, registered to cash.moneyinc@yahoo.com, one of VARGAS' known email addresses, was used to purchase two CVVs from the site on August 9, 2012.

b.     On October 16, 2012, VARGAS posted on the Organization's forum an advertisement for "Cash Money's World Wide Travel Agency" via the "Cashmoneyinc" nic. In it, he boasted "top-notch services for anyone wishing to travel abroad, whether it be to Miami, Tenerife, or Paris. We've got the best deals for you." Details in the post indicated he could provide bookings for flights, hotels, car rentals, "tourist trips," and United States concerts and sporting events. He indicated he would charge a rate of 20% (of the face value) for flights, hotels, car rentals, and "tourist trips," and 30% for car rentals, concerts, and sports events. The post concluded by informing the reader that he accepted payments via Liberty Reserve[1], MoneyGram, or MoneyPak, and that escrow (i.e. co-conspirator SERGEY MEDVEDEV's official Infraud escrow service) was accepted.

---

[1] Liberty Reserve was shut down by the FBI in May 2013. The operators of Liberty Reserve were prosecuted in the Southern District of New York for running a massive money laundering enterprise utilized by cybercriminals (Case No. 1:13-cr-00368-DLC). After Liberty Reserve ceased to exist, Infraud members moved to other types of digital

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT

15

c.     Based on a review of the Infraud forum database previously obtained from a cooperating defendant in another criminal case and authorized by federal search warrant, investigators determined that on October 18, 2012, an unindicted co-conspirator contacted VARGAS using the private message functionality on the Infraud Organization forum, providing him his ICQ contact information to continue the conversation further via chat, and stating "i need to know about a roundtrip from dominican republic to guatemala."

d.     Similarly, a review of the same Infraud forum database revealed that on December 30, 2012 a different unindicted co-conspirator sent VARGAS an Infraud private message, stating "i need some flights to vegas," and providing VARGAS with his ICQ number to continue the conversation further via chat.

e.     From on or about April 26, 2012, through on or about March 1, 2013, VARGAS purchased 31 CVVs from indicted co-conspirator JOHN DOE #4. As with "CCstore," a copy of indicted co-conspirator JOHN DOE #4's automated vending site, "Approved.su," had been previously obtained, this time through the MLAT process from the United Kingdom. A review of that database pursuant to federal search warrant revealed that from on or about April 26, 2012, through on or about March 1, 2013, a specific user account had purchased 31 CVVs from "Approved.su." That user account had a user-provided username of "dvdsvrgs," and it was registered to cash.moneyinc@yahoo.com, a known email address of VARGAS.

f.     A review of the Infraud forum database also revealed that on April 7, 2013,a third unindicted co-conspirator contacted VARGAS via Infraud private message, stating that he needed hotels and flights a few times weekly, and wanting to know what percentage of VARGAS' reservations ended up being cancelled by the hotel or charged back by the credit card companies.

currency such as WebMoney and Perfect Money.   However, the details of these transactions are unavailable to law enforcement at this time.

g.     As previously discussed, VARGAS remains a member of the Infraud Organization to the present day via the "Cashmoneyinc" nic.

## G.     Attributing "Cashmoneyinc" to VARGAS

24.     VARGAS was identified as the individual behind the "Cashmoneyinc" Infraud nic via the following attribution trail:

a.     In August 2011, Infraud member "Cashmoneyinc" registered with the Infraud Organization forum using email address cash.moneyinc@gmail.com.

b.     A review of the Infraud forum database revealed that on November 19, 2011, "Cashmoneyinc" sent a private message to an unindicted co-conspirator, asking a question and providing the address cash.moneyinc@yahoo.com as a method by which he could be contacted with a response.

c.     The email address cash.moneyinc@yahoo.com was used to register the nic "Cashmoneyinc" on another known carding forum called "Carder.pro." As with the Infraud Organization's forum, Carder.pro was obtained via a cooperating defendant in another case (though a different cooperator than the one who provided the copy of the Infraud forum), and the Carder.pro database was reviewed pursuant to the consent of the database's owner and operator (the cooperating defendant).

d.     On the "Carder.pro" forum, "Cashmoneyinc" posted a "ripper" complaint, alleging that another "Carder.pro" user did not live up to their end of a bargain during a transaction that had been conducted between the two individuals.

e.     In that complaint, Liberty Reserve transaction receipts were posted as part of "Cashmoneyinc"'s "proof" of the other user's wrongdoing. Those Liberty Reserve receipts were corroborated by a review of the Liberty Reserve database itself, and the matching transaction records for the two completed transfers were found. The date, timestamps, and transfer amounts were exact matches to the receipts included in the complaint.

f.     Both transfers, which occurred on August 25, 2010, were from "Cashmoneyinc"'s Liberty Reserve account, U0895585, to the other user's account.

g.     A review of Liberty Reserve account records for U0895585 revealed that it was registered to a user who provided the name "Danny Vazquez," with an email address of djvargas1984@hotmail.com, a street address of "1441 Santa Lucia Rd.," [2] and a user-chosen security question of "Mother's Maiden Name," to which the answer was "muguerza."[3]

## III.   PLACES TO BE SEARCHED AND ITEMS TO BE SEIZED

### A.   Basis for Location to Be Searched

25.     I have probable cause to believe that the TARGET COMPUTER contains evidence based on the following:

a.     At approximately 7:10 am on February 6, 2018, HSI Special Agents (SA) arrested David Jonathan VARGAS at his residence located at 2158 Lago Ventana, Chula Vista, California.

b.     Subsequent to the arrest, SA Nicklaus Jones conducted a consensual interview with VARGAS' wife, Maria Surianita Chavez-Hernandez.  SA Tom Henkels witnessed the interview.  In response to SA Jones' questions, Ms. Chavez-Hernandez summarily stated the following:

i.     The email account cash.moneyinc@yahoo.com belongs to VARGAS, and was used by VARGAS.

---

[2]     In August 2013, VARGAS submitted an application to U.S. Customs and Border Protection's (CBP) Secure Electronic Network for Traveler's Inspection (SENTRI) program.  As part of the application, VARGAS listed 1441 Santa Lucia Road, Chula Vista, California, 91913 as a prior address, and he also listed djvargas1984@hotmail.com as an email address.  This email address is an identical user name, though on a different email provider, to the address provided for the Liberty Reserve account discussed above.  In addition, in January and September 2009, VARGAS was issued traffic citations from the Chula Vista Police Department.  On the citations, VARGAS' address was listed as 1441 Santa Lucia Road, Chula Vista, California, 91913.

[3]     When VARGAS' was arrested on February 6, as described below, SA Beau Menvielle collected VARGAS' personal information per DEA Form 202.  In response to SA Menvielle's question, VARGAS stated that his Mother's maiden name was Muguerza.

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT

ii.      The HP Touchsmart 610 computer located in the residence's upstairs office belongs to VARGAS, and is used by VARGAS.

iii.      VARGAS has possessed of the computer for two to three years.

iv.      Files from previous computers owned by VARGAS had been backed up to and saved on the HP Thouchsmart 610 computer.

c.      At the conclusion of the interview, based upon the facts described above, SA Beau Menvielle detained the HP Touchsmart 610 computer, which was located on top of a computer desk in a second floor office of VARGAS and Ms. Chavez-Hernandez's residence. SA Menvielle documented the detention on a DHS Form 6051 D, Number 1446386. SA Menvielle provided Ms. Chavez-Hernandez with a copy of the form, and advised Ms. Chavez-Hernandez that he would be in contact with her regarding the disposition of computer.  In addition, SA Jones provided his contact information to Ms. Chavez-Hernandez.

d.      HSI Special Agent David Marshall, a Computer Forensics Agent certified by the HSI Cyber Crimes Center ("C3"), participated in the warrant and took possession of the detained TARGET COMPUTER. He documented the states of the TARGET COMPUTER by taking photographs of the computer's visible Windows desktop displayed on the monitor before conducting a soft shut down of the TARGET COMPUTER. Neither SA Marshall, myself nor any other agent has conducted a search of the contents of the TARGET COMPUTER.

**B.      Basis for Items to Be Seized**

26.      Based on my experience and training, consultation with other law enforcement officers experienced in fraud and Internet-based criminal carding investigations, and my investigation in this case, I have probable cause to believe that I will find electronic evidence on the TARGET COMPUTER:

a.      I know from my training and experience and conversations with other agents experienced in investigations in fraud and Internet-based criminal carding investigations that online "clubhouses," such as the Infraud Organization's web-based

forum, may only be accessed by members using digital devices. Further, I know from my training and experience in these types of investigations that certain portions of such online "clubhouses" may only be accessed by registered members, such as VARGAS under the guise "Cashmoneyinc," and that such access requires a password known by the holder of the account or the nic.

        b.    I know from my training and experience pertaining to computers, digital devices, and the Internet, that generally any user who accesses a website such as the Infraud Organization's web-based forum will leave traces of that visit behind on their digital device's storage media. This usually takes the form of cached files, such as images, HTML files, or other rendered parts of websites, that comprise the website visited and that are downloaded by the user's web browsing software in order to speed up future visits to that website. Likewise, I know that when a user interacts with a website, such as via logging in to their password-protected account to access a restricted area of the site, that activity also leaves behind traces of this interaction in a similar way and for similar reasons.

        c.    Therefore, because VARGAS remains a member of the Infraud Organization to this day via the nic "Cashmoneyinc," and because there is documented criminal activity conducted by him using the Infraud Organization's forum and the nic "Cashmoneyinc," I have probable cause to believe that the TARGET COMPUTER will contain indicia of his Infraud Organization membership and of his interaction with Infraud's website and his fellow members.

## IV.   PROCEDURES FOR ELECTRONICALLY STORED INFORMATION – COMPUTERS

### A.  Genuine Risks of Destruction

    27.    Based upon my experience and training, and the experience and training of other agents with whom I have communicated, electronically stored data can be permanently deleted or modified by users possessing basic computer skills. This is not a

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT

1   concern here, unless the subject receives advance warning of the execution of these
2   warrants.

3   **B.    Prior Attempts to Obtain Data**

4          28.    The United States has attempted to obtain some of the evidence detailed in
5   Attachment B, including records linking "Cashmoneyinc" to VARGAS, from prior email
6   search warrants and evidence obtained from the Infraud database and other carding sites.
7   However, these other attempts necessarily did not cover the full scope of data that would
8   be available at VARGAS's residence; no prior attempts have been made to obtain this data
9   directly from VARGAS. Prior to VARGAS' arrest, I unsuccessfully applied to Magistrate
10  Judge William V. Gallo on February 2, 2018 for a search warrant to search VARGAS'
11  residence.

12  **C.    Procedures to Protect Third Party Privacy**

13         29.    All forensic analysis of the imaged data will employ search protocols directed
14  exclusively to the identification and extraction of data within the scope of this warrant.  In
15  the event that the personnel lawfully conducting the analysis identify information
16  pertaining to crimes outside the scope of the warrant, such information will not be used
17  except to obtain a new warrant authorizing a search for such information.  In the event a
18  new warrant is obtained, the government may make use of the data seized in any lawful
19  manner.  Absent a new warrant, the personnel conducting the analysis may continue to
20  search for and seize data only within the scope of this warrant.

21  **D.    Procedures for Electronically Stored Information**

22         30.    With the approval of the Court in signing this warrant, agents executing this
23  search warrant will employ the following procedures regarding computers and other
24  electronic storage devices, including electronic storage media, that may contain data
25  subject to seizure pursuant to this warrant:

26                                   Forensic Imaging

27         a.    After securing the premises, or if sufficient information is available pre-
28  search to make the decision, the executing agents will determine the feasibility of obtaining

AFFIDAVIT IN SUPPORT OF APPLICATION                     21
FOR SEARCH WARRANT

1   forensic images of electronic storage devices while onsite. A forensic image is an exact
2   physical copy of the hard drive or other media. A forensic image captures all the data on
3   the hard drive or other media without the data being viewed and without changing the data.
4   Absent unusual circumstances, it is essential that a forensic image be obtained prior to
5   conducting any search of the data for information subject to seizure pursuant to this
6   warrant. The feasibility decision will be based upon the number of devices, the nature of
7   the devices, the volume of data to be imaged, the need for and availability of computer
8   forensics specialists, the availability of the imaging tools required to suit the number and
9   nature of devices found, and the security of the search team. The preference is to image
10  onsite if it can be done in a reasonable amount of time and without jeopardizing the
11  integrity of the data and the agents' safety. The number and type of computers and other
12  devices and the number, type, and size of hard drives are of critical importance. It can take
13  several hours to image a single hard drive - the bigger the drive, the longer it takes. As
14  additional devices and hard drives are added, the length of time that the agents must remain
15  onsite can become dangerous and impractical.

16          b.      If it is not feasible to image the data on-site, computers and other
17  electronic storage devices, including any necessary peripheral devices, will be transported
18  offsite for imaging. After verified images have been obtained, the owner of the devices will
19  be notified and the original devices returned within forty-five (45) days of seizure absent
20  further application to this court.

21                     Identification and Extraction of Relevant Data

22          c.      After obtaining a forensic image, the data will be analyzed to identify
23  and extract data subject to seizure pursuant to this warrant. Analysis of the data following
24  the creation of the forensic image can be a highly technical process requiring specific
25  expertise, equipment and software. There are thousands of different hardware items and
26  software programs, and different versions of the same programs, that can be commercially
27  purchased, installed, and custom-configured on a user's computer system. Computers are
28  easily customized by their users. Even apparently identical computers in an office or home

environment can be different with respect to configuration, including permissions and access rights, passwords, data storage, and security. It is not unusual for a computer forensic examiner to have to obtain specialized hardware or software, and train with it, in order to view and analyze imaged data.

d.       Analyzing the contents of a computer or other electronic storage device, even without significant technical challenges, can be very challenging. Searching by keywords, for example, often yields many thousands of hits, each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant hit does not end the review process for several reasons. The computer may have stored metadata and other information about a relevant electronic record – e.g., who created it, when and how it was created or downloaded or copied, when it was last accessed, when it was last modified, when it was last printed, and when it was deleted. Keyword searches may also fail to discover relevant electronic records, depending on how the records were created, stored, or used. For example, keywords search text, but many common electronic mail, database, and spreadsheet applications do not store data as searchable text. Instead, the data is saved in a proprietary non-text format. Documents printed by the computer, even if the document was never saved to the hard drive, are recoverable by forensic programs because the printed document is stored as a graphic image. Graphic images, unlike text, are not subject to keyword searches. Similarly, faxes sent to the computer are stored as graphic images and not as text. In addition, a particular relevant piece of data does not exist in a vacuum. To determine who created, modified, copied, downloaded, transferred, communicated about, deleted, or printed the data requires a search of other events that occurred on the computer in the time periods surrounding activity regarding the relevant data. Information about which user had logged in, whether users share passwords, whether the computer was connected to other computers or networks, and whether the user accessed or used other programs or services in the time period surrounding events with the relevant data can help determine who was sitting at the keyboard.

e.     It is often difficult or impossible to determine the identity of the person using the computer when incriminating data has been created, modified, accessed, deleted, printed, copied, uploaded, or downloaded solely by reviewing the incriminating data. Computers generate substantial information about data and about users that generally is not visible to users.  Computer-generated data, including registry information, computer logs, user profiles and passwords, web-browsing history, cookies and application and operating system metadata, often provides evidence of who was using the computer at a relevant time.  In addition, evidence such as electronic mail, chat sessions, photographs and videos, calendars and address books stored on the computer may identify the user at a particular, relevant time.  The manner in which the user has structured and named files, run or accessed particular applications, and created or accessed other, non-incriminating files or documents, may serve to identify a particular user.  For example, if an incriminating document is found on the computer but attribution is an issue, other documents or files created around that same time may provide circumstantial evidence of the identity of the user that created the incriminating document.

f.     Analyzing data has become increasingly time-consuming as the volume of data stored on a typical computer system and available storage devices has become mind-boggling.  For example, a single megabyte of storage space is roughly equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is roughly equivalent of 500,000 double-spaced pages of text.  Computer hard drives are now being sold for personal computers capable of storing up to 2 terabytes (2,000 gigabytes) of data.  And, this data may be stored in a variety of formats or encrypted (several new commercially available operating systems provide for automatic encryption of data upon shutdown of the computer).  The sheer volume of data also has extended the time that it takes to analyze data.  Running keyword searches takes longer and results in more hits that must be individually examined for relevance.  And, once reviewed, relevant data leads to new keywords and new avenues for identifying data subject to seizure pursuant to the warrant.

g.    Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including hashing tools to identify data subject to seizure pursuant to this warrant, and to exclude certain data from analysis, such as known operating system and application files.  The identification and extraction process, accordingly, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within one-hundred twenty (120) days of this warrant, absent further application to this court.

h.    All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

## V.    **CONCLUSION**

31.    Based on the foregoing, there is probable cause to believe that the items identified in Attachment B are evidence of a crime, contraband, fruits of a crime or other items illegally possessed, or were designed for use, intended for use, or used in committing a crime in violation of  18 U.S.C. § 1962(d) (Conspiracy to Engage in a Racketeer Corrupt Influenced Organization); 18 U.S.C. § 1028(a)(7) (Identity Theft); 18 U.S.C. § 1029(a)(3) (Possession of More than Fifteen Unauthorized Access Devices); 18 U.S.C. § 1343 (Wire Fraud); 18 U.S.C. § 1030 (Fraud and Related Activity in Connection with Computers); 18 U.S.C. § 1344 (Bank Fraud); and 18 U.S.C. § 1956 (Money Laundering) and will be found at the premises to be searched as provided in Attachment A.

BEAU MENVIELLE
Special Agent,
Homeland Security Investigations

Subscribed and sworn to before me this ___14th___ day of February, 2018.

HON. ANDREW P. SCHOPLER
United States Magistrate Judge
**ANDREW G. SCHOPLER**

**Attachment A**

**LOCATION TO BE SEARCHED**


The computer to be searched ("TARGET COMPUTER") is an HP TouchSmart 610 All-In-One computer belonging to David VARGAS that was detained on February 6, 2018, and is currently in the possession of the Department of Homeland Security Cyber Crimes Center.

1

**Attachment B**

**ITEMS TO BE SEIZED**

The items to be seized include certain items, documents, and records (in electronic or hardcopy form)[1] relating to membership in the Infraud Organization and use or access to the Infraud Organization website, <u>limited to</u>:

1. <u>Indicia of Infraud membership</u>: Any and all indicia of Infraud membership, to include records and documents with the graphics or code used on the Infraud forum, and with the graphics used as avatars for any Infraud nic;

2. <u>Records referencing Infraud</u>: Any and all documents or records referencing the Infraud Organization, to include any and all documents referencing Carderbase, the Infraud Organization's feeder forum;

3. <u>Records referencing the nic "Cashmoneyinc:"</u> Any and all documents or records referencing the nic "Cashmoneyinc," or any other Infraud nic;

4. <u>Passwords, encryption keys, or other access information</u>: Any and all documents or records containing computer passwords, encryption keys, or other information that is required to access the data stored in digital devices seized within the scope of this warrant;

---

[1] The terms "items," "documents," and "records" include all items of evidence in whatever form and by whatever means they may have been created or stored, including any electrical, electronic, or magnetic form (such as any information on an electronic or magnetic storage device, including hard disks, ZIP disks, CD-ROMs, DVD-ROMs, optical discs, backup tapes, printer buffers, smart cards, memory calculators, personal digital assistants or smart phones such as iPhones or iPads, as well as printouts or readouts from any magnetic storage device); handmade form (such as writing, drawing, painting); mechanical form (such as printing or typing); and photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies).

5. <u>User</u>-attribution data: Data reflecting who used or controlled the computer or electronic storage device at or around the time that data reflecting criminal activity within the scope of this warrant was created, accessed, deleted, including registry information, computer logs, user profiles, and passwords, web-browsing history, cookies, electronic mail stored on the computer or device, electronic address books, calendars, instant messaging logs, electronically-stored photographs and video, file structure and user-created documents, including metadata.

which constitute evidence of violations of 18 U.S.C. § 1962(d) (Conspiracy to Engage in a Racketeer Corrupt Influenced Organization); 18 U.S.C. § 1028(a)(7) (Identity Theft); 18 U.S.C. § 1029(a)(3) (Possession of More than Fifteen Unauthorized Access Devices); 18 U.S.C. § 1343 (Wire Fraud); 18 U.S.C. § 1030 (Fraud and Related Activity in Connection with Computers); 18 U.S.C. § 1344 (Bank Fraud); and 18 U.S.C. § 1956 (Money Laundering) from the period August 4, 2011 through the present.

This authorization includes the search of physical documents and includes electronic data to include deleted data, remnant data, and slack space. The seizure and search of computers and computer media will be conducted in accordance with the computer search protocol provided in the affidavit submitted in support of this warrant.